Okay, if you are ready. May it please the court, my name is Christine Levin from Deckert LLP. I'm here today on behalf of the appellant, Norman Shelton, and I would like to reserve three minutes for rebuttal. Ms. Levin, help me to understand what in the world happened here before the district court, if anything, between the time the complaint was filed and the time the document was filed by you folks, to, in short, why wasn't there a Rule 16 conference, or at least a scheduling order, ever issued? Your Honor, I can't speak to why there wasn't a Rule 16 conference, because that's something that typically the court schedules, and in my experience, typically the court schedules that after there's an answer to the complaint, and there was not an answer to the complaint filed. This court, this case, didn't follow any pattern that I'm familiar with either. I spent 14 years as a district judge, and so I'm familiar with Rule 16, for that matter it's various iterations over the years, and what strikes me is that even though Rule 16 conference wasn't required, certainly, and there's no answer filed here because what your adversary filed was an alternative motion, as I understand it, I would have expected that once there's a request for discovery, there would have been some activity at the district court end to address that request, whether it was in the form of a conference or a conference call, or an order establishing some discovery schedule. Did anything happen here during that gap of time from 8-30 of 11, when I think your complaint was filed, to 10-24 of 2012 when the summary judgment? Nothing, Your Honor, other than the motion to dismiss or for summary judgment was filed. Our class certification motion was fully briefed, and then in response to the motion for summary judgment, we gave an affidavit explaining the discovery that we planned to take. It was essentially our document requests and our interrogatory. Did you include affidavits with your opposition to the summary judgment motion? No, we did not, and I can explain why. Why? Okay, well, yes. First of all, as I said, we gave the Rule 56D affidavit explaining the discovery that we needed. Did you explain why there was no discovery in the affidavit, though? I'm not sure whether we explained why there was no discovery. You explained what you needed. Correct. And how much time had left when you filed your Rule 56 affidavit? The complaint was filed at the end of August. It took us a while to obtain service over the defendants, and it took some period of November before the Department of Justice agreed to accept service on behalf of some of the defendants. Did they agree to accept service, or was there a waiver of service? They agreed to accept service. Okay. And then... And you moved for class December 9 of 11. Right. And then the motion to dismiss or for summary judgment was filed on February 10, 2012. Correct. So there's... No discovery takes place at all, and the discovery really can't take place because you've got no discovery order having been set out. Correct. I mean, that was part of our concern about taking discovery was that... I mean, there were several concerns about taking discovery. By the way, is your office doing this pro bono? Yes, we are, Your Honor. Okay. And we have a number of cases arising out of similar situations. Well, interestingly, because you are counsel, one of my law clerks noted earlier in our work on this case that the district court docket notes it as a pro se case despite the eventual... This particular case, we were involved from the beginning in this case, but there's another Mr. Shelton is... It's on remand. There's one on remand. Right. There's one on remand that was also just recently in front of the Court of Appeals, so it's possible... And that is a pro se case. So I wonder if there was some confusion. Perhaps. I haven't looked at the district court docket, but it has... This particular case, I do not believe, has ever been pro se. We drafted and filed the complaint. Could I have some clarification, too, as to the language? You've been asked about, and you yourself have referred to an affidavit. Was it an affidavit or a declaration? Because the rule has evolved over the years. It was a declaration. All right. Thank you. And it does say in paragraph 5, defendants... I mean, we point out the unusual nature of the procedural posture. Defendants have immediately moved for summary judgment relief pursuant to Rule 56 before any discovery has taken place. For instance, Mr. Shelton has not had the opportunity to take the depositions of persons involved in cell assignments generally, or Mr. Shelton's cell assignment in particular. And it goes on to explain that state of mind is an important issue in these cases and that we would like discovery on that. And we have four pages of detailed types of discovery, document requests we would like to have, people we would like to depose. We're in a situation here where, obviously, you don't like to take depositions before you've gotten documents, and under the rules, we're only entitled to 10 depositions, and we have more than 10 defendants in the case. So there were a lot of issues of that sort. You don't know what to ask. You're saying you'd be put in a position of taking a deposition without knowing what to ask the witness because there's no documents. There's no documents. We certainly need to have some documents in our hands before we can do that. And the class was the request for class certification was denied along with the dismissal? Same day, right? Same day. The class was denied and then the claims were dismissed, I believe, was the order in which it occurred. Yes. So to go back to a couple of the questions that have been asked, why we didn't take discovery, one is that there had not been a Rule 16 conference. There had not been any of the typical negotiations you have. Tell me about Mr. Shelton. Has he a perpetual litigant? Mr. Shelton? Has he been in and out of the penitentiary? Oh, in and out of the penitentiary? I believe he's been in prison for quite some time and he has been in and out of Lewisburg and the SMU. He was there, I think, in 2006 and 2007 and then went back in in 2009. I beg your pardon. Is it Levin or Levin? I'm from North Carolina and it's Levin. Levin. I know it both ways. Ms. Levin, is it fair to characterize this record as one in which the district court completely ignored your declaration seeking discovery? That is certainly our position. There is not a word in the district court's decision. And went on to grant some rejection. Correct. And under the Abington-Friends decision from this court, we believe that was an abuse of discretion. I think the words that the Abington-Friends case uses, it was improper. But clearly the Abington-Friends case, I think, is most like our situation. There's a suggestion from the other side that you should have filed a motion. Is there any authority for a motion? You know, I think that when you read these cases, sometimes parties do file a motion. So sometimes they file a motion. But the rule doesn't require it. The rule does not require it, but I think that's where some of the language in the cases comes from. In fact, maybe a few of our cases have used the language of motion, which has suggested that it might be a requirement. Abington-Friends uses that language. But I think if you look at the Dowling decision, it makes it very clear. I believe it's pages 139 and 140. It makes it very clear that an affidavit is what's required, just like the rule says. An affidavit is what is required. Can you help me with the class certification, too? Because I'm not quite sure what happened there. It looks like the district court misunderstood that either the nature of the relief you were seeking in the class action part of your complaint or misunderstood the class you were trying to get certified or both. I think the court ‑‑ I don't know which it was that the court misunderstood, but certainly the class we were trying to certify was all inmates within the penitentiary, within the SMU, not ‑‑ Within the penitentiary? Within the SMU. And future prisoners. Right, and future prisoners. Within the general population subject to the policies of SMU. Correct. And it happens at this point that that's almost everybody in the penitentiary. While I have pointed to what I consider some perhaps errors by the district court or at least some matters overlooked, with respect to class certification here, the district court, in his opinion, explicitly relied on ascertainability in denying class certification. And I believe, and he did so having failed to cite our Marcus decision, which had actually come down about two months before the decision. I'm not sure, though I have been concerned about hearing from both sides on the class certification issue, because this court has a fairly recent but robust jurisprudence as to ascertainability, beginning with Marcus in 2012 and more recently the Carrera opinion, as well as I'm drawing a blank on the third and very recent opinion against Walmart. Walmart v. Dukes? No, no, no, no. The Supreme Court? That's the Supreme Court decision of 2000. No, Walmart gets sued all the time. Judge Sirica wrote this opinion just within the last month. But in any event, nobody really has cited to or argued any of that jurisprudence and suggested how it should have affected the district court's ascertainability determination. Hayes is the one you're thinking of. Hayes, thank you very much. Right. I think the first response to that is the class we proposed is ascertainable, a class of all inmates in the SMU, current and future inmates in the SMU at USP Lewisburg. So that, I think, is just the first step. Well, you say that in a conclusory way, but how is it ascertainable if the district court applied an ascertainability standard or at least language of ascertainability that does not find its source in at least Marcus, which is our first question. Well, I don't think that the court viewed our class as being all inmates, all future and current and future inmates at USP Lewisburg in the SMU. Should we send this back and ask the district court to look at ascertainability in light of the Marcus line of cases? And beyond that, there's a real big open question here. This is a B2 action, right? Correct. You're seeking injunctive and declaratory relief. And as far as I know, all the ascertainability jurisprudence has been applied in B3 actions. Correct. So there's a lingering question as to whether or not ascertainability is even an appropriate standard to be applied. Right. And, you know, because we felt our class was ascertainable, we didn't get into those issues in our brief in the court below. Shouldn't we send it back? The district court really didn't address A1 issues, did he? No. I mean, he pretty much talked solely about ascertainability. He did not get into Rule 23 requirements, A through 23A, 1 through 4, or 23B2. He misunderstood our class or he misunderstood our relief. That's sort of a joke analysis. If you look at the class the district court thought it was being asked to certify, he's absolutely right, there's no way to get into that without many trials and it's totally unascertainable, assuming ascertainability applies to this kind of class. But the class that the district court apparently thought it was being asked to certify is not the class that you have in your complaint. It's not the class you're asking to certify. And the district court seemed to believe that class members had to all have actually sustained injury from the policy in question. And the case law, I think, is abundantly clear to get into Your Honor's question about ascertainability, that in a B2 case, there are murmurings, they weren't holdings, they were, you know, not issues that were in dispute. But in the Baby Neal case, which is a leading Third Circuit case on B2. Common, but it's a case uncommon. One that's frequently cited. Yeah. And the Hassine decision also. And Baby Neal, as oft cited as it is, may be subject to some question in the wake of Walmart. Uncommonality, but it does have some discussion about ascertainability and references Rule B2 and says it's often applied to cases where classes are not ascertainable and they're amorphous. And in that particular case, like our case, they were seeking a class that was as defined, well, not like our case, somewhat unlike our case, that was as defined, was a somewhat unascertainable class. It was all children who had been abused and neglected in the city of Philadelphia. Very large amorphous. It was a large amorphous class. The class in Hassine, again, a prison conditions of confinement case. All prisoners at, I think it was Graterford in that particular case. I think the difference between B3 and B2 classes, to get to the bottom of it, is that in B2 cases you really are looking at common conduct applied to the class as a whole. The Walmart decision talks about whether an indivisible injunction will provide relief to all the class. So the difference also in terms of the relief, if you're talking about dollar damages, almost by definition you've got a real problem. Exactly. Injunctive relief, that's very different. And that was one of the issues that was in the Carrera case that Your Honor identified. The first issue for why you need an ascertainable class in B3 is the fact that B3 actually has a common issues predominate requirement. But isn't it quite conceivable that you could have a numerosity question in a B2 action that would make ascertainability an appropriate concept? I can imagine any number of B2 cases, not ours, but other kinds of B2 cases. Speaking only for myself, obviously it's hard for me to imagine that numerosity would not be met in your case. Correct. But speaking hypothetically. Absolutely. You have B2 cases that challenge, for example, handicap access and have, you know, you might say the supermarket counter line is too high for people in wheelchairs. So would you say that the very nature of the numerosity requirement under A1 suggests that ascertainability may, in appropriate cases, be a concept that's applicable in a B2 action? Absolutely. There are B2 actions, as Walmart recognizes. They say you've got to keep them small and closely cabined. But there are B2 actions where some sort of statutory damages apply. So obviously you need to ascertain who the class members are and who is entitled to those. Or some kind of restitutionary sort of claim along with the injunctive or declaratory. Exactly. But Walmart does counsel that we need to keep those cases closely confined because B2 doesn't have a notice and an opt-out provision. Which is a big reason counsel for the plaintiffs in that case chose to go the B2 route, among other reasons. I think personally it was going back to a long body of law that views back pay as an equitable remedy. And the court was struggling with how to deal with that in a class of one and a half million people. It might work in a... Courts across the country have struggled with that or had struggled with that for many years. Right. So when you've got a small workplace with 20 people, it might work. But when you have one and a half million, it's a different animal. So I hope I've answered the ascertainability question. My time is out. I did, but I can't find it. We have you back. Okay. Thank you. May it please the Court. Michael Butler from the United States Attorney's Office in Harrisburg. I represent the United States of America and the prison officials. Mr. Butler, does the penitentiary keep records of inmate versus inmate violence? The penitentiary keeps records, no, Your Honor. They don't? They keep records. I think what you're asking is do they keep records of incidents that happened. And the answer to that is yes. Do they categorize what those incidents are for? No. Why are they fighting? They don't categorize those. But they do. They know the number of inmate altercations that there have been in the penitentiary? And do they keep them by the month, or how do they keep them? There is an attachment to the appellant's motion to certify, and in that they list incident reports. And I didn't do the math. I will believe them that there's 272 incident reports were issued. What do you mean per issue? So if there's a fight between them. I mean like in a certain month. In a certain month. I believe that they're categorized by month, but I'm not sure. They have to report those incidents. There's a 583 and a 586 that they report. What are 583 and 586? 583s are a report of incident, when an incident actually happens. In the penitentiary. In the penitentiary. And a 586 is an after-action review, what the internal audit showed why that incident occurred. Well, inmate-on-inmate violence is a very common phenomenon in any prison, at least depending upon the size of the institution. It would certainly be, if not easy, quite possible to cull from whatever records you have, those incident reports that represent inmate-on-inmate violence. You could certainly do that. Yes, sir. You could also isolate any incident reports that have to do with violence involving a particular inmate. Right? Like Mr. Shelton. I think so. Isn't that the purpose of the Quay hearing? Isn't it to get at that kind of potential danger? To get at the Quay. It's a Quay proceeding where the inmate comes in and they determine if there's any separation needs that this inmate has. Whether or not there's an inmate on the compound that poses a danger to him. He'll present that evidence, and then the VOP will review it. But I wanted to take a step back, because the 272 incident reports that are mentioned in the appendix in the motion to certify, so if you have one fight, then there's two incident reports issued, one to inmate A and one to inmate B. So then you have to divide that in half. If you have three inmates involved, you divide that by three. Right. So the number 272 isn't accurate. Well, it's not inaccurate. It may be misleading. It may be. And in any event, what's the import of that? I'm missing something. I don't know what the import is, Your Honor. Their motion to certify was that 272 represents some policy. I think we have to peel back the onion on this policy. No, isn't it just saying that what they're trying to do is get relief for anyone who is now or may be exposed to the policies of the SMU or the SHU. And that would seem to me to be. . . SMU is Southern Methodist. They play football. The way they play, they may belong in the institution. Your Honor, you nailed that on the head. It would be very easy to look at who's in the prison, and those folks are subject to the shoe. But I think you just nailed it on the head about what the difference is between our opinion as to the class definition. Their class definition, they say, is just the SMU inmates. But that's not the case. Just the who? Just the SMU inmates from. . . SMU? SMU is the Special Management Unit. SMU? The SMU. We call it SMU. I'm sorry. We call it the SMU. The SMU. I can't believe anything this guy says. So they say that the class starts when they file the complaint to the period when this unconstitutional policy is rectified. So in their actual class definition is the policy. The policy itself. . . Again, let's peel the onion here. What do they say in their complaint about a policy? Who initiated this policy? Where did this policy come from? I can tell you. Aren't there a few policies referred to? Isn't there a policy with respect to how quickly or under what circumstances guards should respond to an altercation between inmates and that response should not be made until there's a lieutenant who has reported? There seems to be some. . . Is there such a policy? There seems to be some subclasses of what they're arguing. They argue that. . . That's not an answer to my question. Is there such a policy? No. No, there is no policy. All right. The complaint in paragraph 125 is the only place where you'll find a policy, and they say, Cain, Norwood, Bledsoe, Young, and Weir were aware based on position and grievances. That is the extent of a policy. Where else in the complaint do they say a policy? And this is the class action stage. There's no policy to ask the prospective inmate if there's another inmate with whom he should not be self? There is a Quay proceeding where they ask, Do you feel that you're in danger in any way in this? And then they have records from the court. The district court will provide information about who testified against that inmate, if that inmate testified about somebody else, and they have a procedure called the CIM, the SIM procedure, where you look at the separatees of the inmate. Doesn't the very fact of our discussion here relative to the existence well-known of certain policies point to the need for discovery in this case? Your Honor, that's an Iqbal problem. What we have is a conclusory allegation, and we're trying to make a careful case management approach. In Iqbal, it's similar. Actually, Iqbal was even better asserted facts. In Iqbal, they said the director of the FBI and the attorney general made a policy. Here, they didn't even say that anybody made a policy. Can you justify pursuing a different avenue? The fact that the district court appears to have completely ignored the declaration and request for discovery. I don't know whether or not they ignored it, Your Honor, or they discovered it. We know at least that record-wise it is completely silent with respect to any response to that filing, right? Well, Your Honor, they didn't file a motion for me to respond to it. Beg your pardon? I'm sorry. If your question was did anybody respond to that declaration? Did the district court ever do anything of record to even acknowledge, metaphysically, the existence of the declaration that was filed? Other than discrediting it as part of the summary judgment. Now, I don't know what the district court was thinking when it granted summary judgment, but that's why a 56-D motion is important. Now, Your Honor's mentioned in the case law. Why would it be important for us to know what the district court was thinking? If we were reviewing the district court's decision, wouldn't it be helpful to know what went into the decision? It kind of juices up the process a little bit. I agree. To be able to figure that out. I agree. So why shouldn't we send it back just on that purpose alone? Because I think that they failed. They should have filed either a motion or they should have used evidence. Was they as being the opponent? Shelton. Okay.  Superior Offshore says the proper course is to file a motion. Doe versus Abington School District says if a non-movement needs discovery, you file a motion. In fact, on page 14 of their brief, Shelton's brief, counsel recognizes that in order for this court to look and see if the district court abuses discretion in denying a motion, you have to file the motion. Don't you – aren't you really arguing sub silentio there? That if that's what those cases say, this court has adopted a kind of supervisory rule that goes beyond 56D and requires the filing of a motion because I see nothing at all in 56D that says a motion has to be filed. I completely agree with you. And if I understand your argument from the brief correctly, your suggestion was that a motion for stay should have been filed. A motion for stay or discovery? Move for discovery. If you can't get discovery – I read motion for stay, but in any event – all right. I thought it was – But I think it's either or. I think if you need discovery, you move for it. But really what's important here is that that rule, 56D, says what's unavailable to the non-moving. Mr. Shelton, let's talk about exhaustion. They want to discover your exhaustion. They want policies and procedures. Why? That's a really difficult – I will ask, Ms. Levin, I don't understand the whole exhaustion statement either as to why they couldn't take – Why – Why they couldn't exhaust. Why, why? And so why didn't Mr. Shelton file an affidavit or declaration saying, I did exhaust. He didn't. It's unavailable. They need to show to this court that they didn't have the proper means to respond to our motion. They did. For another purpose, they say that they were relying on their pleadings, that there were six officers that responded. But the pleading is a pleading. When I filed – You mean that the six officers that responded or six officers that were there? The six officers were there that were supposed to have – that could have responded to the alleged fight. So – You don't think they're – by the way, you said alleged fight. Oh, no, there was a fight. There was a fight. Okay. But I meant the allegation that they didn't – Well, there was also a fight. That they didn't go in. All six of them didn't go in. And we presented evidence that four of them weren't even in the building at the time. I'm sorry. Where did you present evidence? We had attached the roster – Because there was no discovery here. So where did that evidence come from? That was our evidence. We produced the roster. The question was not who had possession of the evidence. Where did that evidence come from? From the Bureau of Prisons, Lewisburg. Produced in what form? Produced it to the court. Filed it in an exhibit to the Statement of Material Facts. We had that. We gave that to the district court. The district court considered that. And rather than filing a declaration, they relied on the pleadings. And that was appended to your motion alternatively to dismiss or for summary judgment. That's correct, Your Honor. And in response to that motion, which included a Statement of Material Facts, and what you referred to, the plaintiff here wanted some discovery and made a specific request with declaration for it. They did. So you induced certain facts, the kind of facts that, in the ordinary course, might be subject to discovery, which didn't occur here. Well, they had the ability. The rule is, is it unavailable to the plaintiff or the non-moving? And they had the ability to present evidence. They didn't tell the court. How and in what procedural stage? A declaration. A declaration from the plaintiff. They did file a declaration under the rule and indicating what discovery they wanted. And the discovery they requested was, if you look at it, it doesn't respond to the motion for summary judgment. The court never ruled on that, did it? The court did not rule. The court never said that? And there was an issue as to who was present at the time, and those are the kinds of things that they don't have. I understand, and we'll get to the filing that was made under seal in a second. I don't get that either, where the attorney was not allowed to look at the documents that were filed under seal. But even that aside, you're suggesting that the information that they wanted, they had the ability to get without going through discovery? Is that what you're arguing? Well, how many people are in this room? Do we need someone to discover that? They can have a declaration saying there were six people outside my cell. No, we could take judicial notice of that, but I don't think that's the point. But the six people that were outside his cell, where is the declaration that says there were six people outside his cell? That failure to provide a declaration is telling. Where is the declaration that I exhausted? The failure to do that is telling. And the district court looked at their response to the Treatment of Material Facts, and their response is, we're relying on the pleadings. We're relying on the complaint. Fairly soon, but I thought the whole issue of exhaustion went only to the Federal Tort Claims Act, does not go to the class action in terms of the policy of the issue. Is that incorrect? Well, I take issue that there's a policy, because there's no... I just want to ask you about that. If you go through this, go through the rependants, find the policy. In the cases they cite, baby Neal... You really want us to sit and ask? You won't find it. I'll let them point it out to you. Baby Neal, that was deficiencies. That were objective things that you can get your arms around. Can I ask you a basic question? Is there a policy that when an inmate is transferred to the penitentiary, the inmate should not be selled with someone whom he says will hurt him? If an inmate says that he is going to be injured, the BOP takes that consideration. That's deliberate indifference. They determine... No, no answer. That's a yes or a no answer. Is there a policy against selling two prisoners together who actually have a history of violence? Absolutely. Absolutely. But to look at what they're asking for is hostile inmates. We have to define it. That's what the district court was trying to wrap its arms around. Sheldon says he doesn't want to be sold with somebody who's from a D.C. gang. And then inmate Doe doesn't want to be sold with somebody from New York. And inmate Joe... Yeah, all right. They each have their own desires. I guess if I were going to prison, I might have the same thing. I wouldn't sell with anybody. I wouldn't either. But your Honor has asked us to answer a question whether or not ascertainability applies. I've only got 20 seconds. No, no, no. That's all right. You're running out of time. Okay. Ascertainability, whether or not that applies to injunctions. Absolutely. And no one's talking about this yet. Well, then you both agree. I agree. Both sides agree. B-2 in particular, because as a defendant, you have a due process right to know what you're supposed to enjoin. You have to look at this and look at the back end of this. So if the district court ordered an injunction and said, you can no longer sell cellmates with hostile inmates, and that order comes down and the BOP says... First of all, is that, in fact, the policy at the penitentiary? There is no policy. There is no policy? About hostile inmates. No. Wait a minute, wait a minute. This is getting into down the rabbit hole. Yeah, yeah. What is the quay proceeding for? To determine if the inmate is safe on the compound, but it's not to determine if they could stay with what they call hostile inmates. Hostile inmates is subjective. It's what the plaintiff says is hostile. Take some of the air out of the balloon. Just relax a little bit. You're getting so... Wrapped up, sorry. Yeah, exactly. It's not a ball game. It's just there's halftime time out. It's not like watching the Cleveland Browns, which is one of the more unexciting exercises. At least you know the outcome. I feel like I'm like the Eagles. You know the outcome of it anyhow. So just relax. So you said there is no policy? That's what you're saying. There is no policy. There is no policy. Although it starts by saying that there's a policy not to sell hostile inmates. That's not true, right? Not to sell together. I guess I just want to be clear because I don't want to go down the rabbit hole. Their issue is that we sell hostile inmates together. That's their issue, and there is no policy. There's no rule. There's no regulation. There's nothing that says that you should not sell hostile inmates together. I don't know what hostile inmates means. Well, it's obviously subjective, but that's not a rule? No, we don't have a hostile inmates rule. You referred to their issue. Would a little bit of discovery be helpful to actually frame what their issue or issues plural are here? I think the complaint itself is deficient. Under Twombly and Iqbal? Absolutely. All they allege is that we knew about some criticism. Except this didn't go by way of a motion to dismiss. It went by way of a Rule 56 motion that you bolstered with a statement of facts and apparently some additional submission. Well, if Your Honor looks at the order and looks at our argument and looks at the argument in the brief, we argue that the underlying claim doesn't have any merit whatsoever. And so what their argument is supervisory liability. These supervisors should be liable. There is a policy. Forget the tourist thing for a second because that's more problematic. I may not be reading this correctly. I know I'm reading it correctly, but I may not be correct in what I'm reading. If they alleged that you're engaging in a pattern, practice, or policy of improperly placing inmates in cells with other inmates known to the staff of their prison to be hostile, would that be something that on its face anyhow would suggest that there may be a problem? And if it does, wouldn't it be true that everyone who would be subject to be housed in the special housing unit potentially could go, if they're in Lewisburg, potentially they can go to that unit and therefore would be subject to the pattern, practice, or policy of improperly placing inmates in cells with other inmates known to the staff to be hostile. So it's not just Kai coming in saying, you know, I'm from D.C. I don't grow well with these guys from Manhattan. I don't pick up on their vibe. Don't put me with anybody who's from Manhattan, especially if they're south of Houston Street. I really don't relate to them. That's not what we're talking about. We're talking about the prison knowing that inmate X will harm inmate Y if those two are put together. Here they're alleging, I guess it's Carr, that each of them went to the prison and said, look, don't put me with Shelton. Shelton said, don't put me with Carr. There's going to be a problem. So they're alleging anyhow the prison knew it. But despite that, they combined them. And they're going further in saying that if inmates don't go along with this policy... They don't force them. They force them to through use of restraints. Well, in that scenario that they alleged, well, there's multiple questions that you raise. The first thing is... Answer one. Yeah, pick one. The easiest one. The first one was whether or not it's known. So the known is in the actual class itself. So you're assuming that the defendants know. That's not... Whatever it was not the class. That's the conduct. If anyone is in the prison, they would be... If that's... They can prove that that's the practice or policy or pattern. Anyone in the prison would be subject to that policy or practice. When you come down to whether or not there's been an individual problem, that's different. Because all they're asking for is an injunction against enforcing this pattern, practice, or policy. They're not asking for dollar damages. That gets into a whole problem that might be sub B3, and then you've got mini-trials. But as I read it, that's not the theory of their case. They're not asking for it. But my problem is I keep coming back is if you issue an order like that, the defendants have to... Issue an order like what? That says you cannot sell inmates together that are known. Known to be what? Known to be, quote unquote, hostile. That sounds like a real good idea. But you have to determine who those hostile... What inmates are hostile to each other. So if an inmate asks... Well, so they tell you. You ask them and they tell you. So we're relying on the inmates. It's sort of like in... Yeah, what's wrong with that? In Marcus, where you say, hey, tell me if you have these run-flat tires. The court's not relying on the class members. You have to rely on objective evidence. And the defendants, what if... Well, what about if there's been a prior fight between these two guys? If there's a prior fight. There is a separation policy between that. That you will be separated. But there are occasions... They're alleging that your policy is such that you will put those two folks together anyhow, and if they don't go along with it, they're put into restraints. You put them in restraints. I think it's broader than that. I think it's... What is it in fact? What is the policy? You're saying there's none. They're alleging that we put hostile inmates together, as if we're putting them in to fight each other. No, no, no. That's not what they're alleging. We're not talking Spartacus here. It seems like it. They're simply saying... But I read it. I read it. That you've got a blanket policy of knowing that if two inmates are settled together, there isn't going to be a problem. You put them together anyhow, and if either one of those inmates rejects to that or objects to it... You force them. Yeah, you force them by putting them in restraints. That's what they're alleging. And they're alleging that... Is it true? First, let's find out. Is that true? No. No. That's not true. Sounds like Michael Corleone. Stay out of my business, Kate. Practically every case around here eventually turns back to the Godfather. It does. But if you look at the broader spectrum, they're saying that we're forcing without knowing it. So, Mr. Sheldon, I can't be housed with Crips because I'm a Muslim. Why not? What do we have notice that you cannot be put in there with a Crip? Mr. Butler, let me... You're taking the word known out of the equation. If you know that a Crip can't be put in with another guy because a Crip is going to cause this guy a problem... What if we took steps as in deliberate indifference? The defendant has a due process right to the three defenses. We have a right. But we think out soundly that we can put these two together. For instance, they say, hey, we're friends now. We put them together. Or we say we take proper precautions. We're going to do things to prevent this risk. That's what deliberate indifference is about. If we took those defenses... So you would have to apply that to every single case. So? How many are there? There's going to be many trials. Did we take the reasonable precautions? No, you're just enjoying that portion of the policy. You just say, look, you can't have a policy which allows you to put A and B together. If you know if you put A and B together, A is going to hurt B or B is going to hurt A or they're going to hurt one another. You don't do it. Or they're going to mess up the prison. With one another's body parts. Again, they haven't alleged that policy. And at the class certification stage... They have alleged that policy. You've just mentioned the class certification stage. I'd like to ask another question about that. Because I've made clear my doubts about the extent of process that took place with respect to the alternative motion that you filed. But let's talk about the class certification motion filed by the plaintiff here. What extent or degree of process took place before the district court with regard to class certification? One thing we know is there was no discovery. Right? Absolutely not. No discovery. In addition to that, was there any kind of evidentiary hearing? There was no request. So that's a no. That's a no. Does there have to be a request? No, but there doesn't have to be an evidentiary hearing either. Well, I suggest that you give a real careful read to hydrogen peroxide and its progeny and get a handle on the degree and nature of process that is now required in this circuit and many others with respect to certification. Because no longer is a mere complaint going to be enough in most cases. And what I know here is there was no discovery, no hearing. Was there any oral argument on the class certification motion? No. There was no reference to Marcus by the district court. Peroxide calls upon a district court to make a record, which will probably include findings of fact in many or at least most instances. So I would ask you if you can defend in any way, putting aside the motion to dismiss an alternative 56 motion, the lack of process that took place here with respect to Rule 23. Well, Your Honor, Judge Nealon looked at the definition of the class. All right. And he looked at the definition of the class, and that was it. And when he looked at the definition of the class, he didn't find it was ascertainable. And that was it. If the judge found that the class was ascertainable, should there have been more? Probably. So what did he look at, the complaint and your submission? He looked at the information that I didn't provide to the plaintiffs. The plaintiffs, Mr. Shelton, I'm sorry, Mr. Shelton provided the court with a motion to certify, which at that point he said I'm ready to have this case certified. And they presented the 272 incidents, which we don't think means anything, and they attached some sort of an article from a newspaper that cites the Lewisburg Prison Project, which is a prisoner advocacy. That was all they presented to the court to show that they had a proper class. All persons who are currently or will be imprisoned in the SMU program at USP Lewisburg. And it goes on. The class period commences from the time of this filing and continues so long as USP Lewisburg officials and correctional officers persist in the unconstitutional patterns, practices, and policies of placing hostile inmates together in cells or recreation cages. So that definition incorporates the actual policy, which doesn't exist. And if you look at the complaint, it fails. You're saying that the duration of the class is the same as the definition of the class. I'm not sure that's accurate. Duration is just a portion of class definition, isn't it? It's a part of the definition, yes. So what's wrong with this part of the definition? Which part? The part about the hostile inmates? The duration. The duration is it includes when this unconstitutional policy ends. What unconstitutional policy? Well, the one they're alluding is. We are going around. But let's take the SMU. What about the SMU inmates? Let's not. The red light's been on for 13 minutes and 17, 18, 19 seconds. I'll be relieved to sit down. Thank you. Thank you very much. Mr. Levin, you asked for, I guess, three minutes. Could you start by saying, I think you begin by saying there is a policy not to sell hostile inmates together. You think there is such a policy, right? We don't think there's a written policy that says sell hostile inmates together. So it's a practice? It's a pattern or practice. And, in fact, that is how our complaint in the very first paragraph characterizes it, a pattern, practice, or policy. Whether that gets shortened at some point into policy or pattern or practice, I don't know. Is it ever written? I mean, where do you get that? How do you know or on what basis do you say that? That there's a practice of that? A practice pattern. We say that on the basis of what happened to our client and in conjunction with our class certification papers, what happened with Mr. Richardson on the three occasions that he declined a hostile inmate and was placed in hard restraints and ultimately at some point in four-point restraints. Have you talked to the prison about this? We have not spoken with the prison about this. So you've never asked the prison through interrogatories or some other form whether this is the pattern or practice of the penitentiary? If your question is have we had discovery, no, we haven't. We have not had any conversations either through discovery or informally outside the bounds of discovery to talk with them about the situation at Lewisburg. With respect to selling? With respect to sell assignments. Is there anything written with respect to selling? There are various regulations. I don't think any of them really help us out here. One of the things I guess I would like to point out is there's been a lot of talk about how could we enforce an injunction. It would be all this individual stuff about what the basis was for that inmate selling with that inmate. Let's not get into that. I just want to find out from what source do you take the position that they hope not to sell hostile inmates together and that they will force the hostile inmates to get into the cells by restraints? Where does that all come from? That comes from our investigation into this case. It comes from what Mr. Shelton has told us happened to him. And more broadly, the parts that are also in the record are what happened with Mr. Richardson and what happened with Mr. Wiggins. So that's really where it comes from. And I think ultimately what we'd like to, possibly what we'd like to see, I mean, we really do need discovery, and Your Honors see the difficulty we have in understanding policy, no policy, you know, number of incidents, no number of incidents. A resolution here or a proper injunction from a court could be to establish a procedure for evaluating inmate complaints or for evaluating inmate threats. Maybe not threats, but have a procedure for complaints. Well, I think the quay hearing, but the point is that when Mr. Shelton was put in the cell with Mr. Graham back in August of 2009, he got beaten up, okay? He said, don't put me in there. They put him in there. He got beaten up. In November, the same thing happens. Not only does Mr. Shelton say, don't put me in there, but the inmate says, don't put him in here with me. You've got a track record. You know, he was right last time. He gets put in there, and he gets beaten up. There's apparently no policy or procedure for guards at that point to figure out how to evaluate that sort of situation. He grieved his August 2009 selling and being beaten. There's just, there's apparently no procedure in place, perhaps no policy in place for evaluating those kinds of threats. How does this work? If somebody says, okay, the judge says you're going to Lewisburg, what happens as soon as they get there? Is there somebody who sells them? I mean, how does this work in real life? Well, again, that's something, I mean, I think we need a lot of discovery to understand. Well, we know what our client has told us about the Quay hearing and about the central inmate monitoring system that does list some information on the prisoner. But we really do need discovery to understand how that actually plays out in real life. I would like to get a transcript of this. Yes. And you can see the query about how that would work out and just the cost of it. Okay, thank you. I want to thank you very much for a very interesting case. We'll take the matter under advisement. Also, I want to thank, I'm not sure if you're the one who made the decision for Deckard to get involved, but please convey our gratitude and thanks to the folks back at your firm who are allowing you to take this time and take this case pro bono. There are so many cases where we really need this kind of high-quality counsel to intervene, and we'd all be in a world of hurt if we didn't have the good faith of folks like you and your firm. So thank you very much for your efforts. Deckard has done a lot of it lately. He used to be the Schneider firm, but Deckard is now doing it. Mr. Brown and I used to be with Schneider. Oh, really? It's a win-win situation for us. Does Deckard know you're here? Yes, they do. It's a win-win, and we have a lot of very hardworking associates to thank as well. Excellent. And please thank them also. Thank you. Thank you, Mr. Brown. Some of them may be in the audience. This court stands adjourned until Tuesday, November 21 at 9 p.m.